UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN C. PETERS, JR., individually and
as Administrator of the Estate of Amanda
J. Peters, Deceased,

                               Case No. 2:15-cv-2665
           Plaintiff,          CHIEF JUDGE EDMUND A. SARGUS, JR.
                               Magistrate Judge Elizabeth P. Deavers

    v.

DCL MEDICAL LABORATORIES LLC, et al.,

          Defendants.

## OPINION AND ORDER

This matter is before the Court on three motions. Defendants DCL Medical Laboratories

LLC, Laboratory Corporation of America Holdings (as successor of interest to DCL Medical

Laboratories LLC) (collectively, "LabCorp"), and Cathy King (collectively "Defendants") have

filed a Motion to Exclude Plaintiff's Expert (ECF No. 61) and a Motion for Summary Judgment

(ECF No. 63). Plaintiff John C. Peters, Jr. has filed a Motion for Partial Summary Judgment

(ECF No. 64). For the following reasons, Defendants' motions are **DENIED**, and Plaintiff's

motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

### A.    Pap Tests

This case stems from the purported misinterpretation of a Pap test, which is a screening

tool for abnormalities to identify premalignant and malignant changes for cervical cancer. (Defs.'

Omnibus Statement of Facts ("Statement of Facts") at 14, ECF No. 75-1.) A Pap test has two

steps. (*Id.*) First, the ordering physician collects a sample of cells from the outer layer of the

cervix. (*Id.*) And second, the sample is sent to a laboratory where a slide is prepared from the sample and examined under a microscope for cellular characteristics and abnormalities. (*Id.*)

Pap slides are initially screened by a cytotechnologist. (Statement of Facts at 14.) Many laboratories, including LabCorp's, utilize image-guided technology to assist cytotechnologists in their screening. (Mem. in Supp. of Mot. to Exclude at 4 n.1, ECF No. 61-1.) This automated technology pre-screens a slide using complex algorithms to identify certain fields of view for a cytotechnologist to review. (*Id.*) The cytotechnologist then reviews the slide using a microscope with an automated stage that walks her through the fields of view identified by the imager. (*Id.*)

If the cytotechnologist determines that the slide is negative for signs of cellular abnormalities (normal), a report is sent back to the ordering physician and no further action is taken by the laboratory. (*See* Statement of Facts at 14.) If, by contrast, the cytotechnologist sees any suspected cellular abnormalities on the slide, the cytotechnologist sends the slide to a cytopathologist (a physician) for further review. (*Id.*) The cytopathologist makes the final interpretation of the slide. (*See id.* at 15.)

Cytopathologists utilize the Bethesda System to classify abnormalities. (Statement of Facts at 16.) The Bethesda System can be depicted as a pyramid, where each step up the pyramid represents an increase in the abnormal character of the observed cervical cells. (*Id.* at 17.) The Bethesda System classifications range from cells that are within normal limits (NIL) to cancer. (*Id.*) Between these two extremes are benign cellular changes; atypical cellular changes, including atypical squamous cells of undetermined significance (ASCUS) and atypical glandular cells (AGC); low-grade squamous intraepithelial lesions (LSIL); high-grade squamous intraepithelial lesions (HSIL); and carcinoma in situ (CIS). (*Id.*; Bethesda System Pyramid at

PageID 763, ECF No. 16-14.) A finding of NIL or benign cellular changes is considered a normal result. (Statement of Facts at 17.) Anything else is considered abnormal. (*Id.*)

## B. Factual Background

On July 9, 2008, Amanda Peters went to her gynecologist for a Pap test. (Statement of Facts at 1, ECF No. 75-1.) The gynecologist collected a sample from Mrs. Peters and then sent the sample to LabCorp for interpretation and diagnosis. (*Id.*) Defendant Cathy King, a LabCorp cytotechnologist, reviewed the sample (identified as slide L8-P-49705) for one minute and nineteen seconds and signed it out as "negative for intraepithelial lesion and malignancy" (NIL or normal). (*Id.* at 1–2.)

Mrs. Peters had her next Pap test on October 26, 2009. (Statement of Facts at 2.) The slide was again examined by LabCorp personnel, and, this time, the sample was interpreted as containing "atypical squamous cells of undetermined significance" (ASCUS). (*Id.* at 2–3.) On the same day as her Pap test, a nurse practitioner saw a mass on Mrs. Peters' cervix. (*Id.*)

On December 7, 2009, Mrs. Peters saw an obstretrician/gynecologist, Dr. Danielle Martter. (Statement of Facts at 3.) Dr. Martter visualized a 2 cm x 2 cm cervical mass on Mrs. Peters' cervix. (*Id.*) Several days later, Mrs. Peters underwent a colposcopic exam, and Dr. Martter biopsied the cervical mass. (*Id.*) Mrs. Peters was diagnosed as having cervical squamous cell carcinoma (cervical cancer) on December 21, 2009. (*Id.* at 3–4.)

Following her diagnosis, Mrs. Peters was referred to a gynecologic oncologist who recommended a hysterectomy. (*Id.* at 4.) Mrs. Peters underwent a radical hysterectomy and pelvic and periaortic lymph node dissection on January 7, 2010. (*Id.*)

Despite undergoing surgical, radiation, and chemotherapy treatments, Mrs. Peters developed metastatic cervical cancer. (Statement of Facts at 4.) She died from metastatic cancer on August 21, 2014. (*Id.*)

## C.    Procedural History

On July 28, 2015, Plaintiff John C. Peters, Jr., husband of Mrs. Peters and administrator of her estate, filed this case, alleging that Defendants' misreading of the July 2008 Pap slide delayed Mrs. Peters being diagnosed with cervical cancer and that this delay caused her death. (Compl. at 2, ECF No. 1.) Plaintiff asserted claims of negligence, medical negligence, and wrongful death against Defendants LabCorp and Cathy King. (*See id.* at 1–2; Notices of Voluntary Dismissal at 1, ECF Nos. 12, 13.) However, in response to Defendants' current Motion for Summary Judgment, Plaintiff withdrew his negligence and medical negligence claims. (Resp. to Defs.' Mot. for Summ. J. at 2, ECF No. 72.) Consequently, Plaintiff's only remaining claim is for wrongful death. (*See id.*)

In their Motion to Exclude, Defendants challenge the expert testimony of Dr. Martha Bishop Pitman, a cytopathologist and one of Plaintiff's standard-of-care experts. (*See* Mem. in Supp. of Mot. to Exclude at 1, ECF No. 61-1; Statement of Facts at 8, ECF No. 75-1.) Arguing that Dr. Pitman fails to present a reliable methodology for her expert opinions, Defendants have moved to exclude her opinions and to bar Plaintiff from offering her testimony. (Mem. in Supp. of Mot. to Exclude at 1, 19.) And because Plaintiff purportedly cannot succeed on his claims without Dr. Pitman's opinion and testimony, Defendants request summary judgment. (*See* Mem. in Supp. of Defs.' Mot. for Summ. J. at 1, ECF No. 63-1.)

Plaintiff moves for summary judgment only on liability. (*See* Reply in Supp. of Pl.'s Mot. for Summ. J. at 1–2, ECF No. 73.) Plaintiff contends that Defendants' duty and subsequent

breach of that duty is undisputed and that the only issue left to be determined at trial is the amount of damages Defendants owe. (*See* Pl.'s Mot. for Summ. J. at 1, 12–13, ECF No. 64.)

The Court will first address Defendants' Motion to Exclude. It then considers the parties' cross-motions for summary judgment.

## II. MOTION TO EXCLUDE

Federal Rule of Evidence 702 governs the testimony of expert witnesses. The Rule allows for a witness, "qualified as an expert by knowledge, skill, experience, training, or education," to testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).

Under *Daubert*, *Kumho*, and Rule 702, the district court acts as the gatekeeper of expert testimony. *In re Scrap Metal*, 527 F.3d at 528–29. This role, however, is not intended to supplant the adversary system or the role of the jury. *See id.* at 531–32. Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. *See id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 532 (quoting *Daubert*, 509 U.S. at 596).

To be found admissible, expert testimony must satisfy three requirements. First, the witness providing the testimony must be qualified by knowledge, skill, experience, training, or education. *In re Scrap Metal*, 527 F.3d at 529. Second, the testimony must be relevant, meaning that the testimony must help the trier of fact to understand the evidence or to determine a fact in issue. *Id.* The testimony, in other words, must have some "fit" with the issues to be resolved at trial. *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999). And third, the testimony must be reliable. *In re Scrap Metal*, 527 F.3d at 529. In determining the reliability of expert testimony, the district court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Generally, the expert's opinions must reflect "'scientific knowledge' . . . derived by the scientific method." *Daubert*, 509 U.S. at 590. The test of reliability is, however, a flexible one. *Kumho*, 526 U.S. at 141. Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (stating that in *Daubert* "[t]he Court explained that Rule 702 displays a 'liberal thrust' with the 'general approach of relaxing the traditional barriers to "opinion" testimony'" (quoting *Daubert*, 509 U.S. at 588)).

The party proffering the expert testimony carries the burden of establishing, by a preponderance of the evidence, the testimony's admissibility. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

**A.    Dr. Pitman**

Dr. Pitman is the Director of Cytopathology at Massachusetts General Hospital (Mass

6

General). (Statement of Facts at 23, ECF No. 75-1.) She assumed the position in 2011. (Pitman Dep. at 15, ECF No. 61-8.) Since 1991, when Dr. Pitman became an Assistant Pathologist at Mass General, she has reviewed tens of thousands of Pap slides. (*See id.* at 48; Pitman CV at 2, ECF No. 61-6.)

Dr. Pittman is also a Professor of Pathology at Harvard Medical School. (Pitman Dep. at 18–19; Pitman CV at 2.) She teaches doctors (residents) who come to Mass General for their training in pathology or cytopathology. (Pitman Dep. at 19.) And through seminars, she instructs doctors around the world on pathology. (*See id.*)

To reach her opinions in this case, Dr. Pitman reviewed an affidavit outlining the data records for Mrs. Peters' July 2008 Pap slide, and she evaluated the slide through three different reviews. (Pitman Report at 1–4, ECF No. 61-6.) Dr. Pitman evaluated the slide through a blinded review. (*Id.* at 1–2.) She analyzed the results of a blinded review of the slide conducted by seven cytotechnologists at Mass General. (*Id.* at 2–3.) And she traveled to the LabCorp facility in West Virginia to perform a focused review of the slide using the image-guided technology that Ms. King used to screen the slide. (*Id.* at 3.)

Ronald Arpin, a cytotechnologist at Mass General, set up the blinded review for Dr. Pitman and the cytotechnologists. (Statement of Facts at 25, 31.) The blinded review included ten slides: Mrs. Peters' July 2008 slide; two of Mrs. Peters' slides from a 2007 Pap test; and seven distractor slides. (*Id.* at 25.) Before conducting their blinded reviews, neither Dr. Pitman nor the cytotechnologists looked at Mrs. Peters' slides or knew how many of her slides they would be reviewing. (*See* Pitman Dep. 85–86; Pitman Report at 1.) When Dr. Pitman received a FedEx package from Plaintiff's counsel, she handed it unopened to Mr. Arpin and instructed him to choose distractor slides for a blinded review. (*See* Pitman Dep. at 85–88.)

In designing the blinded review, Mr. Arpin reviewed the instructions Dr. Pitman provided him and followed the lead of how Nora Popp, a former co-worker, set up prior blinded reviews. (*See* Arpin Dep. at 111–12, 154, ECF No. 61-12.) Ms. Popp left examples of slides that she would include in blinded reviews. (*Id.* at 111–12.) Mr. Arpin, moreover, researched the American Society of Cytopathology (ASC) Guidelines for Review of Gyn Cytology Samples in the Context of Litigation or Potential Litigation (Guidelines), (*id.* at 155), which advise practitioners to analyze violations of the standard of care for analyzing Pap slides through a blinded review "that includes the contested case as one of a number of normal and abnormal GYN cytology samples representing a variety of disease states," (Statement of Facts at 22).

Mr. Arpin obtained the distractor slides from Mass General's archive. (Statement of Facts at 29.) When choosing distractor slides for blinded reviews, Mr. Arpin chooses slides that a cytotechnologist would encounter on a normal screening day—that is, slides featuring a mix of diagnoses, which range from normal to invasive cancer. (*See* Arpin Dep. at 116–17.) Mr. Arpin also ensures that all of the distractor slides are the same preparation (ThinPrep or SurePath) as the litigation slides. (*See id.* at 127.) And for the blinded review of Mrs. Peters' slides, Mr. Arpin chose distractor slides with normal and abnormal diagnoses, including two slides with an HSIL diagnosis, the same diagnosis that Dr. Pitman eventually assigned to Mrs. Peters' July 2008 slide. (Statement of Facts at 31; Answer Key at PageID 633, ECF No. 61-8.)

After selecting the distractor slides, Mr. Arpin created an answer key for the blinded review. (*See* Arpin Dep. at 132–33.) The answer key listed each slide's identification number, source (Mass General or LabCorp), and Bethesda System classification (assigned by the original reviewer). (*See* Statement of Facts at 29.) To determine the distractor slides' original Bethesda classifications, Mr. Arpin looked up in Mass General's computer system the cytology report

associated with each slide. (*See id.*; Arpin Dep. at 112, 132–33.) Mr. Arpin provided this answer key to Dr. Pitman after she had conducted the blinded review. (Arpin Dep. at 141; Pitman Dep. at 96–97.)

Dr. Pitman conducted her blinded review of the ten slides on May 13, 2013, over the course of 45 minutes. (Statement of Facts at 32.) She determined that Mrs. Peters' July 2008 slide had abnormal cells, which she classified as high-grad squamous intraepithelial lesion (HSIL). (*Id.*)

Between July 18, 2013, and August 5, 2013, the cytotechnologists reviewed the same set of ten slides prepared by Mr. Arpin. (*See* Statement of Facts at 25, 33, 35.) They were asked to determine whether each slide was normal or abnormal. (*Id.*) So that the cytotechnologists would not know that they were conducting a blinded review for a legal matter, they were told that they were conducting a quality assessment. (*See id.*; Arpin Dep. at 158; Pitman Dep. at 165.) Six out of the seven cytotechnologists determined that Mrs. Peters' July 2008 slide contained abnormal cells. (Pitman Report at 2–3.)

Following the blinded reviews, the slides were unblinded, and Dr. Pitman analyzed the results. (Pitman Report at 3.) In Dr. Pitman's opinion, any competent cytotechnologist would have identified the slide as containing abnormal cells and passed the slide to a cytopathologist for further review. (*See id.*; Pitman Dep. at 162.)

On May 15, 2016, Dr. Pitman traveled to LabCorp's facility in West Virginia to conduct a focused review of Mrs. Peters' July 2008 slide using the same image-guided technology (a ThinPrep imager) that Ms. King used to examine the slide. (*See* Pitman Report at 3; Statement of Facts at 36.) LabCorp's ThinPrep imager pre-screens a Pap slide and identifies 22 fields of view for a cytotechnologist to examine. (*See* Pitman Report at 3; Statement of Facts at 36.) With Mr.

Arpin's assistance setting up and calibrating the imager, Dr. Pitman reviewed the 22 fields of view to determine whether they contained reactive or abnormal cells that would have prompted a cytotechnologist to pass the slide along to a cytopathologist. (*See* Pitman Report at 3; Statement of Facts at 36.) Dr. Pitman determined that abnormal cells were present in the fields of view and that the presence of these cells should have prompted Ms. King to do a full manual review of the slide and then pass the slide along to a cytopathologist for further diagnosis. (Pitman Report at 3.)

On January 23, 2017, Dr. Pitman reviewed an affidavit outlining the data records for Mrs. Peters' July 2008 slide. (Pitman Report at 3–4.) The data showed that Ms. King spent one minute and nineteen seconds screening the slide. (*Id.* at 4.) This brief screening explains, in part, why Ms. King failed to appreciate the abnormal cells in the imager's fields of view, Dr. Pitman determined. (*Id.*)

Dr. Pitman concludes her expert report with a summary opinion based on the results of the three slide reviews and her consideration of the affidavit. (*See* Pitman Report at 4.) She opines that Ms. King's screening of the July 2008 Pap slide fell below the standard of care for a reasonably prudent cytotechnologist, that abnormal cells were present in the fields of view generated by the ThinPrep imager, and that Ms. King should have identified those cells and sent the slide to a cytopathologist for diagnosis. (*Id.*) Had Ms. King forwarded the slide to a cytopathologist, the cytopathologist would have made a diagnosis of a high-risk lesion, Dr. Pitman concludes. (*Id.*) That diagnosis, she continues, would have prompted an immediate colposcopy and biopsy, which, in turn, would have detected Mrs. Peters' cervical cancer shortly after the Pap test in July 2008. (*Id.*)

10

## B. Analysis

Defendants have moved for the exclusion of Dr. Pitman's expert opinions because the opinions purportedly lack a reliable methodology. (Mem. in Supp. of Mot. to Exclude at 1, 3, 19, ECF No. 61-1.) Defendants challenge the reliability of each of the three slide reviews underlying Dr. Pitman's opinions. (*See id.* at 6–19.)

### 1. The ASC Guidelines and Dr. Pitman's Testimony on Methodology

Some of Defendants' reliability arguments relate to Dr. Pitman and Mr. Arpin's purported failure to comply with the ASC Guidelines. (*See* Mem. in Supp. of Mot. to Exclude at 6–19, ECF No. 61-1.) The Guidelines state:

> Pap test slides being assessed for an objective unbiased basis on which to assert a violation of a reasonable prudent practitioner standard of practice should first be reviewed without knowledge of clinical outcome and in an environment that simulates the normal screening practice. A violation of a reasonable prudent practitioner standard of practice based on how specific Pap tests were screened and interpreted can only be established through an unbiased blinded rescreening review process that includes the contested case as one of a number of normal and abnormal GYN cytology samples representing a variety of disease states. Focused review or review with knowledge of subsequent development of carcinoma inevitably biases the objectivity of the review against the laboratory and does not reflect the standard practice.

(Statement of Facts at 21–22, ECF No. 75-1.) Dr. Pitman and Mr. Arpin are both members of the ASC. (*Id.* at 20.) Dr. Pitman has testified that she tries to follow the ASC Guidelines in her expert work. (*Id.* at 21.) Dr. Pitman, moreover, was involved in the drafting of an expert witness affirmation statement stating that the person signing the affirmation "will follow the ASC Guidelines for Review of Gyn Cytology Samples in the Context of Litigation or Potential Litigation whenever possible." (*Id.*) Dr. Pitman signed the affirmation in this case. (*Id.*)

Other arguments raised by Defendants relate to Dr. Pitman and Mr. Arpin's supposed non-compliance with Dr. Pitman's own testimony about how a blinded review should be

designed and performed. (*See* Mem. in Supp. of Mot. to Exclude at 6–19.) During her deposition, Dr. Pitman explained the objective of a blinded review. (*See* Pitman Dep. at 87–89, ECF No. 61-8.) A blinded review, she stated, should be designed so that "the litigation slide [does not] stand out in any particular way." (*Id.* at 88.) The goal is to mix up the slides used in the review "so that you can truly not determine which slide is the litigation slide." (*Id.* at 87.) The distractor slides, for example, should "have a range of atypias,"[1] (*id.*), and should have a similar physical appearance to the litigation slide. (*See id.* at 87–89.)

The Court addresses these and other arguments below.

## 2. The Blinded Reviews

Defendants argue that the blinded reviews conducted by Dr. Pitman and the cytotechnologists are unreliable because (a) Plaintiff cannot prove that the reviews were based on any methodology, (b) Mr. Arpin intentionally ignored reliable principles or methods for designing a blinded review, (c) Mr. Arpin did not select proper distractor slides, which caused Mrs. Peters' slides to stand out "like a sore thumb," (d) there is no way to confirm the accuracy of the reviewers' interpretations of the distractor slides, and (e) the cytotechnologists' blinded review was not conducted " in an environment that simulates the normal screening practice." (*See* Mem. in Supp. of Mot. to Exclude at 6–16, ECF No. 61-1.)

### a. Inability to Prove Any Methodology

Defendants argue that Plaintiff cannot prove that *any* methodology was used in designing the blinded reviews because Mr. Arpin is not testifying as an expert and, therefore, cannot explain the methodology he used to set up the reviews. (Mem. in Supp. of Mot. to Exclude at 7, ECF No. 61-1.) Given, however, that Mr. Arpin can testify as a lay witness about the steps he

---

[1] "Atypia" describes cells having a deviation from a normal or typical state. *See* Nat'l Cancer Inst., Dictionary of Cancer Terms, https://www.cancer.gov/publications/dictionaries/cancer-terms?expand=A (last visited Mar. 30, 2018).

personally took to prepare the blinded reviews, this argument fails. *See* Fed. R. Evid. 602 ("A witness may testify to a matter . . . if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *City of Pikeville, Ky. v. Broan-Nutone, LLC*, No. 15-71, 2016 WL 2843916, at \*2 (E.D. Ky. May 10, 2016) ("[The witness] also intends to testify to facts that are within her personal knowledge, which a lay witness is of course entitled to do.").

### b.      Ignorance of Reliable Principles or Methods

Defendants aver that Mr. Arpin "had no idea how to design a reliable blinded review of Mrs. Peters' Pap slides—and made no attempt to learn." (Mem. in Supp. of Mot. to Exclude at 8, ECF No. 61-1.) Mr. Arpin "did not design the blinded review in this matter using **any** discernible principles or methods," Defendants argue. (*Id.* at 13.)

Mr. Arpin's deposition testimony undermines these assertions. In designing the blinded reviews, Mr. Arpin reviewed the instructions Dr. Pitman provided him and followed the lead of how Ms. Popp set up prior blinded reviews. (*See* Arpin Dep. at 111–12, 154, ECF No. 61-12.) Ms. Popp left examples of slides that she would include in blinded reviews. (*Id.* at 111–12.) These samples, Mr. Arpin testified, gave him "a whole library [of slides] to choose from." (*Id.* at 112.) Mr. Arpin also researched the ASC Guidelines. (*Id.* at 155.)

Using the methodology he learned from Dr. Pitman, Ms. Popp, and the ASC Guidelines, Mr. Arpin designed the blinded reviews. (*See* Arpin Dep. at 111–12, 155.) And with direction from those sources, Mr. Arpin designed, according to Plaintiff, an unbiased, blinded review that, in compliance with the ASC Guidelines, "include[d] the contested case as one of a number of normal and abnormal GYN cytology samples representing a variety of disease states."

(Statement of Facts at 22, ECF No. 75-1.) For *Daubert* purposes, the Court is not persuaded otherwise.

### c. Improper Distractor Slides

Defendants contend that the blinded review design is at odds with the ASC Guidelines and Dr. Pitman's instructions and that Mrs. Peters' slides stuck out "like a sore thumb" from the distractor slides because Mr. Arpin did not (i) make any effort to select distractor slides that were physically similar to Mrs. Peters' slides, (ii) consider the diagnoses of Mrs. Peters' slides when selecting the distractor slides, or (iii) ensure that the distractor slides, which all came from Mass General's archives, were unfamiliar to the cytotechnologists. (*See* Mem. in Supp. of Mot. to Exclude at 8–10, ECF No. 61-1.)

Defendants have not produced any evidence establishing that Mrs. Peters' slides stood out as the litigation slides. The distractor slides, like Mrs. Peters' slides, have markings of various colors on them. (*See* Blinded Review at PageID 421–22, ECF No. 61-6.) These markings do not carry any significance except to indicate that someone had previously viewed, and marked, the slide. (*See* Arpin Dep. at 229–30.) Two of the distractor slides were diagnosed (by the original reviewers) as normal—the same diagnosis that each of Mrs. Peters' slides originally received. (Pitman Report at 2, ECF No. 61-6.) And two of the distractor slides were diagnosed (again, by the original reviews) as HSIL—the same diagnosis that Dr. Pitman eventually assigned to Mrs. Peters' July 2008 slide. (*Id.*) The remaining distractor slides had other varied diagnoses: LSIL, Endocervical ACa, and Endometrial ACa. *Id.* And Defendants have not pointed to any evidence indicating that Dr. Pitman or the cytotechnologists had seen the distractor slides prior to the blinded review.

Defendants correctly note that each of Mrs. Peters' three slides have a thin blue line along the top indicating that the slide has already been screened. (*See* Mem. in Supp. of Mot. to Exclude at 9–10; *see also* Arpin Dep. at 202, ECF No. 61-12; Blinded Review at PageID 421–22.) None of the distractor slides has this blue line. (*See* Blinded Review at PageID 421–22.)

But the fact that Mrs. Peters' slides have this distinguishing feature does not undermine the reliability of the blinded reviews because, again, Defendants have not produced any evidence establishing that Mrs. Peters' slides stood out as the litigation slides. For one, all of the slides included in the blinded review had been screened before—a fact evidenced by the markings on each of them. (*See* Arpin Dep. at 229–30.) As such, the presence of a blue line on Mrs. Peters' slides did not convey any special information or distinguish the slides as Mrs. Peters'. And, critically, neither Dr. Pitman nor any of the cytotechnologists had seen Mrs. Peters' slides prior to the blinded review or even knew how many of her slides would be included in the review. (*See* Pitman Dep. 85–86, ECF No. 61-8; Pitman Report at 1.)

Three slides had blue lines on them. (Blinded Review at PageID 421–22.) But this feature means little, and it certainly does not distinguish the slides as Mrs. Peters', given that Dr. Pitman and the cytotechnologists did not know what Mrs. Peters' slides looked like or how many of her slides were included in the review. Assuming that Dr. Pitman and the cytotechnologists noticed the blue line on the three slides (a position Defendants have not taken), they might have thought that the slides with the blue line were the distractor slides. Or Dr. Pitman and the cytotechnologists might have associated the blue line with some other characteristic of the slides. The possibilities go on. This is all to say though that distinctions between slides do not inherently make a group of slides stand out as litigation slides. Only if Dr. Pitman and the cytotechnologists knew to associate specific characteristics with a specific type of slide (i.e., distractor or

15

litigation) would physical differences in the slides compromise the blinded review. (*Cf.* Pitman Dep. at 87–88 (explaining that the objective of a blinded review is to conceal from the reviewer the identity of litigation slides).) And here, Defendants have not pointed to any evidence suggesting that Dr. Pitman or the cytotechnologists associated specific features of the slides with a specific type of slide.

### d. Inability to Confirm the Interpretations of the Distractor Slides

Defendants assert that there is no way to confirm the accuracy of the blinded review results because neither Mr. Arpin nor Dr. Pitman "took any steps to confirm the original diagnoses of the seven distractor slides." (Mem. in Supp. of Mot. to Exclude at 11, ECF No. 61-1.) Mr. Arpin, however, did confirm the original diagnoses of the distractor slides: he looked up in Mass General's computer system the cytology report associated with each slide. (*See* Statement of Facts at 29, ECF No. 75-1; Arpin Dep. at 112, 132–33, ECF No. 61-12.)

Defendants also complain that Plaintiff did not provide them with the cytology reports for the distractor slides until after the close of discovery. (Mem. in Supp. of Mot. to Exclude at 12.) This means, Defendants note, that "there is no record evidence confirming the accuracy of the original Pap results" for the distractor slides. (*Id.*)

But Mr. Arpin's deposition is part of the record. And Mr. Arpin testified that he obtained the Pap test results (i.e., diagnoses in the form of Bethesda System classifications) for the distractor slides by reviewing the cytology report for each slide. (*See* Arpin Dep. at 112, 132–33.)

But even if there was no evidence in the record confirming the accuracy of the original diagnoses of the distractor slides, this fact would not cause the Court to find the blinded reviews unreliable. The distractor slides served several purposes in the blinded reviews, but their main

purpose was simply to conceal from the reviewers the identity of the litigation slides. (*See* Pitman Dep. at 87–88, ECF No. 61-8.) The blinded reviews were conducted to determine whether a cytotechnologist should have passed Mrs. Peters' July 2008 slide along to a cytopathologist. (*See* Pitman Report at 2–3, ECF No. 61-6.) They were not conducted to double check the classification assigned to the distractor slides.

Defendants note that a reviewer's interpretation of distractor slides serves as a method of evaluating the accuracy of the reviewer's interpretation of the litigation slides. (Mem. in Supp. of Mot. to Exclude at 11.) This is, however, not the only way to evaluate a reviewer's accuracy. Accuracy can be evaluated by comparing reviewers' interpretations against each other. Thus, if one reviewer concludes that a slide shows no abnormal cells but all of her colleagues conclude otherwise, then one might question the accuracy of the reviewer classifying the slide as normal.

Plaintiff's ability to identify in the record the cytology reports associated with the distractor slides would bolster Dr. Pitman's opinions. But Plaintiff's inability to do so here does not render the blinded reviews, or Dr. Pitman's opinions based on those reviews, unreliable.

       **e.**    **Deviation from the Cytotechnologists' Normal Screening Practice**

Lastly, Defendants contend that blinded reviews are unreliable because they were not conducted "in an environment that simulate[d] the [cytotechnologists'] normal screening practice," as required by the ASC Guidelines. (Mem. in Supp. of Mot. to Exclude at 14.) The blinded reviews differed from the cytotechnologists' normal screening practice in four ways: (i) the cytotechnologists manually screened the blinded review slides (they normally screen the slides with an automated imager); (ii) the cytotechnologists were told that they were performing a "quality assessment" (a task not normally assigned to them), (iii) the cytotechnologists were not provided any patient information for the blinded review slides (they normally learn the

patient's age, the date of her last menstrual period, and any relevant medical history provided by the ordering physician), and (iv) the cytologists submitted their results in binary (normal or abnormal) form (they normally designate in their report a specific Bethesda System classification). (*Id.* at 14–15.)

Cytotechnologists in Dr. Pitman's laboratory do not regularly review slides in anticipation of litigation. (*See* Statement of Facts at 34, ECF No. 75-1.) But the fact that the cytotechnologists' normal screening practice differs from the screening methods that they used here does not automatically render their determinations unreliable. *See Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1333 (11th Cir. 2014) (criticizing the ASC Guidelines and noting that "neither *Daubert* nor *Kumho* permits a scientific or medical community to define a 'litigation standard' that applies when its members are sued"). And, in fact, it does not even evidence a failure to comply with the ASC Guidelines. The Guidelines call for a screening environment in the litigation context that *simulates* the normal screening practice. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/simulate (last visited Mar. 30, 2018) (defining "simulate" as "to give or assume the appearance or effect of"). The Guidelines do not call for a screening environment in the litigation context that is identical to the normal screening practice.

Given that the cytotechnologists at Mass General are not full-time litigation support personnel, some deviation from their standard practice was required. And none of the deviations identified by Defendants cause the Court to conclude that the blinded reviews are unreliable.

Defendants note that the cytotechnologists normally screen slides using an automated imager. (Mem. in Supp. of Mot. to Exclude at 14.) But nothing in the record suggests that the cytotechnologists are unqualified to manually review slides, that the cytotechnologists'

18

interpretation accuracy declines when they review slides manually, or that there is any other disadvantage to manual reviews.

Defendants also note that the cytotechnologists only perform "quality assessments" when they are reviewing slides for legal cases—and that at least one cytotechnologist (Mr. Arpin) understands this. (Mem. in Supp. of Mot. to Exclude at 14–15.) But even assuming that the other cytotechnologists—the ones, unlike Mr. Arpin, who completed the blinded reviews—knew that they only performed quality assessments in association with legal cases, Defendants point to no evidence suggesting that this knowledge impacts the cytotechnologists' screening.

Defendants observe that patient information was not provided to the cytotechnologists for the blinded review slides. (Mem. in Supp. of Mot. to Exclude at 15.) However, as Plaintiff notes, revealing patient information for the blinded review slides might have revealed the identity of Mrs. Peters' slides. (*See* Resp. to Mot. to Exclude at 18–19, ECF No. 71.) Defendants suggest that the medical information about the slides in the blinded reviews could have been included if the Peters slides were separated into three different review sets. (Reply in Supp. of Mot. to Exclude at 10 n.5, ECF No. 74.) But this strategy would not have alleviated Plaintiff's concern. The cytotechnologists likely would have noticed that one slide in each set contained the same patient information.

Defendants' concern with the cytotechnologists evaluating the blinded review slides using a binary system (abnormal or normal) is also unavailing. The Bethesda System utilizes at least eight classifications to identify cellular changes. (Bethesda System Pyramid at PageID 763, ECF No. 16-14.) And the cytotechnologists at Mass General typically use this system when interpreting slides. (Statement of Facts at 33–34.) However, in screening a slide as part of a Pap test, a cytotechnologist performs an essentially binary task: he can either report the slide as

normal, and no further review will take place, or he can report the slide as abnormal (utilizing, of course, one of the Bethesda classifications), and the slide will be sent to a cytopathologist for further review. (*See id.* at 14.) Based on her review of the cytotechnologists' blinded reviews, Dr. Pitman concluded that Mrs. Peters' slide should have been sent to a cytopathologist for further review. (Pitman Report at 3, ECF No. 61-6.) To draw this conclusion, Dr. Pitman did not need to know the Bethesda classification that each cytotechnologist assigned to Mrs. Peters' blinded slide. She simply needed to know whether the cytotechnologists would have passed the slide along to a cytopathologist for further review. And a finding of anything other than normal (i.e., abnormal), conveyed that information to Dr. Pitman. (*See id.*; Statement of Facts at 14.)

Defendants argue that the use of a binary system to evaluate the blinded review slides conflicts with Dr. Pitman's own practices because Dr. Pitman purportedly only considers there to be a "discrepancy" in a slide's interpretation if there is a difference of at least two steps in the Bethesda System between the cytotechnologist's interpretation and the cytopathologist's interpretation. (Mem. in Supp. of Mot. to Exclude at 15–16.)

But this argument misstates Dr. Pitman's testimony: Dr. Pitman testified that she was *not* involved in calculating discrepancy rates at Mass General. (Pitman Dep. at 52–53, ECF No. 61-8.) The argument misinterprets Dr. Pitman's discussion of discrepancies too. Dr. Pitman explained in her deposition that Mass General calculates discrepancy rates for cytotechnologists as an internal evaluation tool, (*see id.* at 50–56), not as a method of determining whether a cytotechnologist breached a standard of care. And, in any event, Mass General tracks *any* difference in interpretation between the cytotechnologist and the cytopathologist reviewing a slide—even differences involving only one step in the Bethesda System. (*See id.* at 53–54.)

20

Defendants also argue that the use of a binary system conflicts with the ASC Guidelines, which state that the Bethesda classifications ASCUS (atypical squamous cells of undetermined significance) and AGUS (atypical glandular cells of undetermined significance) "do not represent consistently identifiable abnormalities and a reasonable basis for allegations of practice below a reasonable prudent practitioner standard of care." (Mem. in Supp. of Mot. to Exclude at 16.) Because the binary system did not allow the cytotechnologists to indicate whether the blinded review slides were ASCUS or AGUS, the cytotechnologists' blinded review cannot support Dr. Pitman's opinions, Defendants assert. (*Id.*)

This argument falls flat, as it overlooks the primary purpose of the cytotechnologists' blinded review. Dr. Pitman, as noted above, relied on the review to conclude that Mrs. Peters' July 2008 slide should have been sent to a cytopathologist for further review. (Pitman Report at 3.) Dr. Pitman did not rely on the cytotechnologists' blinded review to determine the Bethesda classification that she ultimately assigned to Mrs. Peters' slide. (*See id.*) She relied on her own blinded review in making that determination. (*See id.* at 2; *see also id.* at 4 ("I believe that a *pathologist* would have made a diagnosis of a high-risk lesion . . . ." (emphasis added)).)

### 3. The Focused Review

Defendants also challenge the reliability of Dr. Pitman's focused review of Mrs. Peters' July 2008 slide. (Mem. in Supp. of Mot. to Exclude at 16–19, ECF No. 61-1.) According to Defendants, the focused review is unreliable because (a) it is not a blinded review, (b) Dr. Pitman did not conduct her blinded review under her normal screening conditions, and (c) Dr. Pitman failed to conduct or document her review in a logical, reliable manner. (*See id.* at 17–18.)

#### a. Non-Blinded Review

Defendants contend that the focused review was biased, and in violation of the ASC

Guidelines, because it was not blinded. (*See* Mem. in Supp. of Mot. to Exclude at 17, ECF No. 61-1.) But the ASC Guidelines do not prohibit all non-blinded reviews. (*See* Statement of Facts at 22, ECF No. 75-1.) Rather, the Guidelines state that "[a] violation of a reasonable prudent practitioner standard of practice based on how specific Pap tests were screened and interpreted can only be established through an unbiased blinded rescreening review process." (*Id.*) And here, Dr. Pitman was able to determine, based only on the blinded reviews, that Ms. King had breached the standard of care. (*See* Pitman Report at 3, ECF No. 61-6 ("Once the blinded reviews were complete, the slides were unblinded . . . and the results analyzed by me. Based on this data, I came to the conclusion that [Ms. King breached the standard of care].").)

Because the focused review was not blinded, there was a risk that Dr. Pitman's review would be biased. The danger posed by Dr. Pitman's potential bias was minimized though given the limited purpose for which she conducted the focused review—determining whether the fields of view prepared by the automated imager would show abnormal cells. (*See* Pitman Dep. at 201, ECF No. 61-08; Pitman Report at 3.) And regardless of whether Dr. Pitman's focused review was biased, bias in an expert witness's opinion is usually a credibility issue for the jury, not a basis for the Court to exclude the opinion as unreliable. *Adams*, 760 F.3d at 1332–33.

### b.  Deviation from Dr. Pitman's Normal Screening Practice

Defendants also challenge the focused review because, in purported contravention of the ASC Guidelines, Dr. Pitman did not conduct the review under conditions simulating her normal screening practice. (*See* Mem. in Supp. of Mot. to Exclude at 17–18, ECF No. 61-1.) Dr. Pitman conducted the review using a ThinPrep imager, a device that she is not certified to use; she relied on Mr. Arpin to help her use the imager, but he had not interpreted a ThinPrep slide on an imager since becoming certified to do so; and Dr. Pitman spent as much as 95 minutes reviewing Mrs.

Peters' slide for the focused review whereas she completed her blinded review of ten slides in only 45 minutes. (*Id.*)

The focused review is not automatically unreliable simply because Dr. Pitman did not conduct it in the same way that she normally reviews slides. *See Adams*, 760 F.3d at 1333. And none of the issues raised by Defendants convinces the Court that the focused review was, in fact, unreliable.

Dr. Pitman was not certified to use the imager. (Statement of Facts at 36, ECF No. 75-1.) But Mr. Arpin was, and he assisted her in using it. (*See id.* at 36–37.) And although Mr. Arpin was inexperienced in the imager's use, he was, nonetheless, certified to use it. (*See id.*)

Defendants fail to articulate the connection between Dr. Pitman's potentially lengthy review of Mrs. Peters' slide during the focused review and the purported unreliability of that review. (*See* Mem. in Supp. of Mot. to Exclude at 18.) Defendants might be implying that Dr. Pitman spent more time reviewing the slide than usual because she was trying to find evidence to support a biased opinion. But even if that were the case (and there is no evidence to suggest that it is), the issue is properly be left to the jury to resolve. *Adams*, 760 F.3d at 1332–33 (stating that bias is usually a credibility issue for the jury).

### c. Absence of Documentation and a Logical Methodology

Lastly, Defendants insist that the focused review is unreliable because Dr. Pitman failed to conduct or document the review in a logical, reliable manner. (Mem. in Supp. of Mot. to Exclude at 18, ECF No. 61-1.) Defendants note that Dr. Pitman did not photograph or otherwise record the fields of view containing abnormal cells. (*Id.*) Nor did she record the number of fields of view containing abnormal cells. (*Id.*)

The evidence shows, however, that despite her limited documentation, Dr. Pitman conducted the focused review in a logical and reliable manner. She conducted the focused review to ensure "that the 22 fields of view [that Ms. King reviewed] contained reactive or abnormal cells that would have warranted a full manual review in passing the slide to a pathologist." (Pitman Dep. at 201.) To make that determination, Dr. Pitman went to LabCorp's facility to review Mrs. Peters' slide using the same imager Ms. King would have used. (*See* Statement of Facts at 36, ECF No. 75-1.) And using that imager, with the assistance of a certified operator, Dr. Pitman reviewed the same 22 fields of view that Ms. King reviewed. (*See id.* at 36–37; Pitman Dep. at 201–04, ECF No. 61-8.)

Because Plaintiff has established by a preponderance of the evidence that Dr. Pitman is qualified and that her proposed expert opinions are relevant and reliable, Defendants' Motion to Exclude is **DENIED.** The Court now moves to the parties' cross-motions for summary judgment.

### III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). When the moving party has carried this burden, the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

24

"After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party. *Id.* The nonmoving party, however, cannot establish a genuine issue for trial by producing a mere scintilla of evidence in support of its position. *Anderson*, 477 U.S. at 251; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (showing the existence of "some metaphysical doubt as to the material facts" does not create a genuine issue for trial). A genuine issue for trial exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## A.    Defendants' Motion for Summary Judgment

Defendants request summary judgment on two grounds. They argue that the Court's exclusion of Dr. Pitman's expert testimony will leave Plaintiff unable to prove the elements of his claims. (Mem. in Supp. of Defs.' Mot. for Summ. J. at 1–2, ECF No. 63-1.) And they contend that Plaintiff's negligence and medical negligence claims are barred by the statutes of limitations and repose. (*Id.*)

Plaintiff has withdrawn his negligence and medical negligence claims. (Resp. to Defs.' Mot. for Summ. J. at 2, ECF No. 72.) And the Court has denied Defendants' Motion to Exclude—the basis for Defendants' summary judgment argument. Accordingly, Defendants' Motion for Summary Judgment is **DENIED**.

## B.    Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for summary judgment on his wrongful death claim. Under Ohio law, "a wrongful death claim must be predicated upon a separate tort." *Smith v. United States*, No. 3:95cv445, 2012 WL 1453570, at *45 (S.D. Ohio Apr. 26, 2012). And here, Plaintiff asserts that his underlying claim is for negligence. (*See* Pl.'s Mot. for Summ. J. at 12–13, ECF No. 64.)

"To bring a wrongful death action upon a theory of negligence, the plaintiff must show (1) the existence of a duty owing to the plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of the duty and the death." *Thompson v. Wing*, 637 N.E.2d 917, 923–24 (Ohio 1994). The parties focus their arguments on breach and proximate causation.

### 1.    Breach

Plaintiff contends that he is entitled to summary judgment on the issue of breach because (1) Ms. King only spent one minute and nineteen seconds reviewing Mrs. Peters' July 2008 Pap

slide and (2) Dr. Pitman has opined that Ms. King breached her duty to Mrs. Peters. (*See* Pl.'s Mot. for Summ. J. at 8, ECF No. 64.)

This issue presents a classic summary judgment problem. The party moving for summary judgment "bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact." *Moldowan*, 578 F.3d at 374. When the moving party has carried this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita*, 475 U.S. at 586). The non-moving party cannot simply "rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Id.*

Here, Plaintiff has moved for summary judgment and has presented Dr. Pitman's expert opinions in support of his motion. Dr. Pitman opines that Mrs. Peters' July 2008 Pap slide indicated abnormal cells—specifically, high-grade squamous intraepithelial lesion (HSIL). (Statement of Facts at 32, ECF No. 75-1.) And she further opines that Ms. King's screening of the July 2008 slide fell below the standard of care for a reasonably prudent cytotechnologist. (Pitman Report at 4, ECF No. 61-6.) Ms. King should have identified the abnormal cells in the slide and passed the slide along to a cytopathologist for further review, Dr. Pitman concludes. (*Id.* at 3–4.)

With Plaintiff's burden met, Defendants must now set forth specific facts showing that there is a genuine issue for trial. Defendants do not have an expert witness who will opine on whether Ms. King, in her interpretation of the July 2008 Pap slide, breached her duty to Mrs. Peters. (*See* Resp. to Pl.'s Mot. for Summ. J. at 5, ECF No. 70.) Defendants do not point to any testimony or documents that would counter Dr. Pitman's conclusion that Ms. King's

interpretation of the slide was a breach of duty. (*See id.* at 5–7.) Defendants simply note that they "do not concede that Dr. Pitman's . . . opinion regarding Mrs. Peters' 2008 Pap slide [is] accurate, or that [her] testimony is reliable." (*Id.* at 6–7.) At trial, Defendants intend to undermine Dr. Pitman's conclusions with cross-examination and facts that allegedly contradict her underlying assumptions and methodology. (*Id.* at 7.) Defendants, in other words, intend to present the jury with all of the evidence supporting its Motion to Exclude. (*Id.* at 8.)

The Court has already reviewed the evidence, and arguments, supporting Defendants' Motion to Exclude. In an effort to establish that Dr. Pitman's opinions are unreliable, Defendants attacked Dr. Pitman's credibility, accused her of bias, and highlighted seeming inconsistencies in her methods. (*See* Mem. in Supp. of Mot. to Exclude at 6–19, ECF No. 61-1.) The Court rejected all of these arguments and determined that Dr. Pitman is qualified and that her expert opinions are relevant and reliable. For the same reasons that the Court rejected Defendants' arguments on Dr. Pitman's reliability, the Court concludes that no reasonable jury could credit Defendants' arguments or reject Dr. Pitman's opinions on Ms. King's breach of duty. In the absence of any expert medical testimony to the contrary, the Court does not weigh or evaluate conflicting evidence in this instance. Instead, Plaintiff offers admissible expert testimony on the issue of negligence. Defendants offer no expert testimony to the contrary.

Defendants cite a case from this Court for the proposition that a defendant is not required to present expert testimony to rebut the plaintiff's expert testimony on an issue in which the plaintiff bears the burden of proof. *Capital City Energy Grp., Inc. v. Kelley Drye & Warren, LLP*, 975 F. Supp. 2d 842, 851 (S.D. Ohio 2013). In such cases, the Court stated, "a rebuttal expert is not necessary where the defendant can refute the plaintiff's expert testimony through cross-examining the expert and presenting independent evidence demonstrating that the expert's

opinions were unfounded." *Id.* But *Capital City* differs from this case in an important way: the Court had not already reviewed, and denied, a motion to exclude plaintiffs' expert. *See id.* In *Capital City*, the Court had not determined, as it has here, that the defendants' arguments for undermining the expert's opinion are unconvincing. *See id.*

> Defendants also cite a case from the Sixth Circuit in which a panel of that court stated:

> "There are many circumstances in which testimony need not be accepted even though formally uncontradicted," *Sheppard v. Maxwell*, 346 F.2d 707, 726 (6th Cir. 1965) . . . . "[T]he jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion." *United States v. 0.161 Acres of Land in Birmingham, Ala.*, 837 F.2d 1036, 1040–41 (11th Cir. 1988).

*Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 797–98 (6th Cir. 1996). This pronouncement does not assist Defendants though.

First, the pronouncement is dicta. In *Powers*, the Sixth Circuit decided an appeal from the trial court's denial of the plaintiffs' motions for judgment as a matter of law or for a new trial. *Powers*, 83 F.3d at 795–96. As part of that appeal, the plaintiffs asked the Sixth Circuit to determine whether the trial court had erred in instructing the jury: "You are not required to accept testimony even though the testimony is uncontradicted and the witness is not impeached." *Id.* at 797. The Sixth Circuit indicated that the trial court did not err in its instruction and stated that the jury could have rejected the witnesses' testimony even if the testimony was uncontradicted. *Id.* at 797–98. The witnesses' testimony, however, was not uncontradicted: cross examination revealed considerable weaknesses in their testimony. *See id.* at 798–99. So, although the Sixth Circuit's comments about a jury's ability to disregard expert testimony are insightful, the comments are dicta and not binding on the Court.

And second, the pronouncement, even if it was binding, would not constitute a general rule but rather an exception to the rule. Citing the United States Supreme Court, the *Powers* court

explained that "as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court." *Id.* at 798 (quoting *Quock Ting v. United States*, 140 U.S. 417, 420 (1891)). The rule has exceptions though, including one that seems to fit the circumstances in *Powers*, where "[t]here may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting evidence." *Id.* (quoting *Quock Ting*, 140 U.S. at 420).

Plaintiff, in sum, has met its burden on summary judgment by producing Dr. Pitman's expert opinions on Ms. King's breach of duty. Faced with this evidence, Defendants have failed to meet their burden of setting forth specific facts showing that there is a genuine issue for trial. Because Plaintiff is entitled to judgment as a matter of law and Defendants have failed to identify any genuine issues of material fact for trial, Plaintiff's request for summary judgment on the issue of breach is **GRANTED**.

## 2. Proximate Causation

Plaintiff also argues that he is entitled to summary judgment on proximate causation. (*See* Pl.'s Mot. for Summ. J. at 8–9, ECF No. 64.) The expert opinions of Dr. Pitman and Dr. Matthew Boente establish proximate cause, Plaintiff asserts. (*See id.* at 6–7.)

Dr. Pitman opines that Ms. King should have identified the abnormal cells in the July 2008 slide and sent the slide to a cytopathologist for additional review. (Pitman Report at 4, ECF No. 61-6.) Had the slide been sent to a cytopathologist for review, Dr. Pitman opines that the cytopathologist would have detected Mrs. Peters' cervical cancer shortly after the July 2008 Pap test. (*Id.*)

Dr. Boente, a gynecologic oncologist retained as an expert in this case by LabCorp, purportedly "offered testimony that had Amanda Peters' Slide been identified as HSIL in July

2008, she would have had several options for treatment available to here, which would have likely revealed Amanda had severe dysplasia or early stage cancer at that time." (Pl.'s Mot. for Summ. J. at 6–7.) And according to Plaintiff, Dr. Boente further opined "that had Amanda been treated in July 2008 she would not have died from metastatic cervical cancer, and she would not have been a high risk for reoccurrence of cancer." (*Id.* at 7.)

For the same reasons that a reasonable jury might reject Dr. Pitman's opinions on Ms. King's purported breach, a reasonable jury might reject her opinions on causation. *See Capital City Energy*, 975 F. Supp. 2d at 851; *Powers*, 83 F.3d at 797. And although Plaintiff can rely on Dr. Pitman for the assertion that a cytopathologist would have classified Mrs. Peters' July 2008 slide as HSIL and that this classification would have led to an earlier discovery of Mrs. Peters' cervical cancer, Plaintiff cannot rely on Dr. Pitman for the further assertion that Mrs. Peters would have survived because of this early discovery. (*See* Pitman Report at 4.) Dr. Pitman indicated in her deposition that she would not offer any causation opinions about Mrs. Peters' prognosis or the survivability of her cancer. (Pitman Dep. at 227, ECF No. 61-8.)

Plaintiff relies on Defendants' expert, Dr. Boente for this further assertion. (*See* Pl.'s Mot. for Summ. J. at 6–7.) But, contrary to Plaintiff's argument, Dr. Boente's opinions do not support a finding of summary judgment in Plaintiff's favor. Dr. Boente opines that even assuming Mrs. Peters' July 2008 Pap slide had been read as HSIL, Mrs. Peters likely would have been recommended a LEEP for treatment, which would not have prevented her from developing cancer in 2009. (*See* Boente Report at PageID 2196, ECF No. 70-2.) Dr. Boente opines, in other words, that even if Mrs. Peters' July 2008 slide had been read as Dr. Pitman opines that it should have been, Mrs. Peters would still have had a high chance of dying of her cervical cancer. (*See id.*) Dr. Boente explained:

31

I do not believe as has been suggested by the plaintiff's expert witness that Ms. Peters had invasive squamous cell carcinoma present on her cervix at the time of her July 2008 pap smear. Rather I believe that the cancer developed in the interim high in the endocervix and subsequently spread to the ectocervix. Glassy cell carcinoma of the cervix is a rare and unfortunate histologic subtype of cervical adenocarcinomas. Despite early diagnosis (Stage I disease), these tumors can carry up to a 50-60% mortality. In addition, since they are a subtype of adenocarcinoma, they develop high in the endocervical canal and are difficult to diagnose. Pap smears sample cells primarily from the ectocervix, and a physician cannot visualize all of the endocervical canal while performing a pap smear. Therefore, it can be difficult to identify cervical dysplasia or adenocarcinoma of the endocervix on a pap smear. I am not aware that a pre-invasive form of glassy cell carcinoma has ever been reported.

(*Id.*) Because the jury could reasonably believe Dr. Boente's opinions over the opinions of Plaintiff's experts, the Court concludes that there is a genuine issue of material fact for trial on the proximate causation of Mrs. Peters' death.

These issues of fact defeat Plaintiff's request for summary judgment on proximate cause.

### IV. CONCLUSION

For these reasons, Defendants' Motion to Exclude (ECF No. 61) and Defendants' Motion for Summary Judgment (ECF No. 63) are **DENIED**, and Plaintiff's Motion for Partial Summary Judgment (ECF No. 64) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

3-30-2018
DATE

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE